UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


MICHAEL R. LAVENDER,          )
                                         )
      Plaintiff,               )
                                         )
   v.                     )      No.  2:11CV0095SNLJ
                                         )             (TIA)
MICHAEL J. ASTRUE,            )
COMMISSIONER OF SOCIAL SECURITY,   )
                                       )
      Defendant.          )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.  The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).  The suit involves Applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security income payments.  Claimant has filed a Brief in Support of his Complaint; the Commissioner has filed a Brief in Support of his Answer.

## I.    Procedural History

Claimant Michael R. Lavender filed Applications for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 132-35)[1] and Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 136-57).  Claimant states that his disability began on March 1, 2010, as a result of a heart condition, COPD, depression, fatigue, and periodic chest pain.  (Tr. 63, 362-63).[2]  On initial consideration,

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer (Docket No. 11/filed March 7, 2012).

[2]In the October 20, 2010 letter, counsel requested the ALJ to amend Claimant's alleged onset date to March 1, 2010 from March 1, 2009.  (Tr. 362).

the Social Security Administration denied Claimant's claims for benefits. (Tr. 63-67). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). On November 16, 2010, a hearing was held before an ALJ. (Tr. 26-59). Claimant testified and was represented by counsel. (Id.). Medical Expert Dr. Ashok Khushalani and Vocational Expert Lorie McQuade also testified at the hearing. (Tr. 44-51, 51-56, 56-59, 110, 111-17). Thereafter, on January 7, 2011, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 5-21). After considering the representative brief, the Appeals Council on October 20, 2011 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-4, 130-31). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on November 16, 2010

#### 1. Claimant's Testimony

At the hearing on November 16, 2010, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 26-59). At the time of the hearing, Claimant was forty years of age. (Tr. 29). Claimant completed the eleventh grade and then completed his GED. Claimant testified that he had problems paying attention at school. Claimant stands at five feet eleven inches and weighs 210 pounds. (Tr. 29). Claimant testified that within a six month time period his weight dropped from 280 pounds to 170 pounds due to his illnesses, depression and COPD. (Tr. 30). Claimant receives Medicaid and food stamps. (Tr. 34). Claimant lives with his girlfriend and newborn baby in her father's house. (Tr. 37). Claimant has nine children, but he

deals with only two children on a weekly basis by watching the children on the weekends.  (Tr. 38).

Claimant testified that a couple of times each week, he experiences heart spasms lasting from ten minutes to two to three hours.  (Tr. 30).  Claimant takes Sotalol as treatment.  Claimant testified that his COPD prevents him from walking a block without having to stop and take a breath.  Claimant uses breathalyzers and nebulizers.  (Tr. 30).  Claimant testified that he also experiences fatigue, and he has been diagnosed with bipolar, paranoid schizophrenia, and post traumatic stress disorder.  (Tr. 31).  His psychological conditions cause him to go into fits of rage over nothing and think people are after him.  (Tr. 31).  Claimant testified that he has attempted to commit suicide six times.  (Tr. 32).  Claimant's depression causes him to barricade himself in his house and to not eat.  (Tr. 32).  Before taking medication, Claimant testified that he would hear things at night.  (Tr. 32).  Claimant testified that his right nervous system causes numbness in his right leg.  (Tr. 33).  Claimant's doctor has advised him to loose weight.  (Tr. 42).

Claimant's medications cause him to be drowsy in the morning.  (Tr. 34).  Dr. Syed has treated Claimant every two to three months for a year.  (Tr. 35).  Claimant testified that his medication knocks him out to the point of being incoherent.  (Tr. 39).

Claimant last worked at Denny's Restaurant as a cook then a waiter.  (Tr. 33).  Claimant testified that he had trouble with supervisors and coworkers when depressed.  He would scream at his coworkers for no reason.  (Tr. 33).  Claimant testified that he worked as a construction worker, but that he has mainly worked in the food industry.  (Tr. 34).  Claimant testified that he has been out of work since February 2010.  (Tr. 34).  On the weekends, Claimant plays board and card games with his children.  (Tr. 39).

Claimant testified that he smokes a joint with friends a couple times a month. (Tr. 35). About four to five years earlier, Claimant testified that he was severely depressed and using cocaine. (Tr. 36). Claimant served prison time after calling a bomb threat at Wal-Mart. While incarcerated, Claimant testified that he received treatment and attended classes. (Tr. 36).

During the day, Claimant testified that he tries to nap. (Tr. 37). His racing mind prevents him from sleeping during the night. After waking up, Claimant fixes something to eat and watches television most of the day. Claimant naps throughout the day. Claimant testified that he does no housework. (Tr. 37). Claimant takes a bath once a week. (Tr. 39). Claimant makes a sandwich. (Tr. 40). Claimant goes grocery shopping with his girlfriend and puts away the groceries at home. (Tr. 40-41). Claimant enjoys playing his Play Station game to keep his mind off other things, but he can only play for thirty minutes at a time. (Tr. 42). Claimant testified that he stays home except when he goes to the grocery store or to doctor's appointments. (Tr. 43).

Claimant testified that he does not have much trouble lifting depending upon how he feels. (Tr. 41). He has problems standing longer than fifteen to twenty minutes because of his leg problems. (Tr. 41). Claimant testified that he could bend over and pick up something on the floor, but this movement would cause him to become dizzy and light-headed. (Tr. 42). Claimant testified that he has no difficulty following directions or instructions except he likes to do things his way. (Tr. 43).

### 2. Testimony of Medical Expert

Medical Expert Dr. Ashok Khushalani a board certified psychiatrist and addictionologist, did not examine Claimant, but he reviewed the medical data pertaining to Claimant. (Tr. 44). In response to Dr. Khushalani's question about Claimant's Coumadin dependence diagnosis,

Claimant responded that he takes all of his medications as prescribed. (Tr. 44-45). Dr. Khushalani noted that during a consultative examination in December 2009, Dr. Laura Brenner categorized Claimant as having major depressive disorder, alcohol dependence in partial remission, marijuana abuse, and polysubstance obtained full remission. (Tr. 45). Dr. Brenner assessed his GAF to be 50 and found his concentration and memory to be intact and noted Claimant to have held his current job for two years thereby suggesting some degree of self control on the job. Claimant reported some difficulties because of mood swings. During the psychological assessment in January 2010, Dr. Spencer characterized Claimant as having mood disorder and cannabis abuse and assessed his GAF to be 50. (Tr. 45). Dr. Spencer found Claimant would have difficulty engaging in full time employment, because his condition would last longer than twelve months. (Tr. 45-46). Dr. Khushalani noted how Dr. Syed has recently treated Claimant and diagnosed him as having bipolar disorder and cannabis dependence. (Tr. 46). Claimant's medical source statement includes the diagnosis of bipolar disorder, generalized anxiety disorder, normal bereavement, and opiate dependence and the restrictions of being unable to understand and remember detailed instructions, maintaining attention and concentration for extended periods, maintaining regular attendance, and performing activities within a schedule. The medical source statement further indicated that Claimant is unable to complete a normal workday and work week without interruption from psychological symptoms and to perform at a consistent pace without an unreasonable number and length of breaks. Claimant had mild restrictions in traveling to unfamiliar places, making realistic goals or plans independently of others. (Tr. 46).

Dr. Khushalani opined that he had some major disagreements with the most recent assessment, because Claimant has severe bipolar disorder, and he continues to use marijuana as admitted in his testimony. (Tr. 46). Dr. Khushalani explained how it is difficult to assess a pure clinical picture. For instance, Dr. Khushalani noted in Dr. Syed's assessment, drug addiction and/or alcoholism are listed as a diagnosis. (Tr. 46). Dr. Khushalani explained how it would be hard to make an assessment into the future as to how an individual would be if he stopped using drugs, because it is hard to determine whether the individual would have such a severity without the use of drugs or alcohol. (Tr. 47). Dr. Khushalani noted that the assessment determined Claimant's ability to remember work like procedures and ability to understand and carry out short and simple instructions to be mildly limited, but then determined his ability to perform activities within a schedule, maintain regular attendance, and be punctual with customarily tolerance to be markedly limited. Dr. Khushalani questioned why would any parameters be markedly limited when an individual is performing simple tasks. Dr. Khushalani noted that as far as the goals are simple, there should be no marked limitations. (Tr. 47). Further, Dr. Khushalani noted that most of Claimant's diagnoses of bipolar disorder have been made when Claimant was under the influence of drugs. (Tr. 48).

Dr. Khushalani opined that in a true clinical picture, the individual would have to be totally sober for at least six months to a year before the diagnosis of bipolar disorder could be made. (Tr. 48). Accordingly, Dr. Khushalani questioned validity of the diagnoses of bipolar disorder, because he does not know if Claimant had used drugs and alcohol. Dr. Khushalani found taking all the evidence into consideration Claimant's mental condition does not meet or medically equal the criteria of Listing 12.04, 12.06 or 12.09. (Tr. 48). In response to counsel's question

regarding Claimant's marijuana use to be one to two times a month, Dr. Khushalani explained that marijuana stays in an individual's system for no more than thirty days. (Tr. 49). Dr. Khushalani explained that Dr. Syed's medical source statement contains an assessment setting forth limitations remaining if Claimant stopped using drugs or alcohol. Dr. Khushalani faulted the assessment inasmuch as Claimant had not been sober for six months. (Tr. 49). Dr. Khushalani opined that "[y]ou cannot make an assessment on an individual today and say if he stops using drugs then he'll continue to have these severe limitations." (Tr. 49-50). Dr. Khushalani explained that he disagreed with the assessment inasmuch as Claimant was using drugs at the time and thus no one would know if the individual would continue to have severe limitations even if the individual stopped using the drugs. (Tr. 50). Dr. Khushalani questioned even if Claimant stopped using marijuana whether he would still have the same difficulties. (Tr. 50). For instance, Dr. Khushalani noted that Claimant was able to sustain employment by working as a server in December 2009 even though he was using marijuana and without treatment. (Tr. 51). Noting how Claimant started treatment with Dr. Syed in April 2010, Dr. Khushalani opined that one would presume with treatment and medication, Claimant would do better than he was doing in December 2009 when he was able to sustain employment and work as a server. (Tr. 51).

The ALJ noted that all of the evaluations in the record were done while Claimant was using drugs, and Dr. Khushalani hesitated projecting inasmuch as there is no evaluation on record when Claimant was not using drugs. (Tr. 56). The ALJ asked Dr. Khushalani to provide an opinion as to Claimant's criteria B if he was not using drugs. (Tr. 57). Dr. Khushalani indicated this would be speculative and opined "[i]n activities of daily living would be mildly affected. Maintaining social functioning would be moderately affected. Maintaining concentration,

persistence or pace on simple tasks would be mildly affected." (Tr. 57).

### 3. Testimony of Vocational Expert

Vocational Expert Lorie McQuade, a vocational rehabilitation counselor, testified in response to the ALJ's questions. (Tr. 51-55, 111-17). Ms. McQuade testified that Claimant's past work as a server/waiter is light, semiskilled entry level work as defined by the Dictionary of Occupational Titles. (Tr. 52).

The ALJ asked Ms. McQuade to assume

based on his age, education and past work experience, assume I find he has to alternate between the sitting and standing at will, lift up to ten pounds, sedentary level. He must work indoors in a clean air environment and you've heard Dr. Khushalani's testimony that basically puts him down to unskilled, simple, one-two, take him out of the detailed and that's the same things, as a matter of fact, from his medical source statement from his treating doctor, Dr. Syed, also said he could do simple, work related, unskilled. He took him out of the detailed. So based on that could he do his past relevant work?

(Tr. 52). Ms. McQuade responded no and indicated that there would not be any transferable work skills. (Tr. 64). Although the DOT does not put forth sit/stand options for occupations, Ms. McQuade has placed individuals in employment with sit/stand options such as an eyeglass frame polisher, a semiconductor binder, and a surveillance system monitor jobs. (Tr. 52-53).

Claimant's counsel asked whether an individual at the Class 3 level would be able to sustain past or other types of work? (Tr. 55). Ms. McQuade opined that the description comports with performance of sedentary employment. (Tr. 55).

### 4. Forms Completed by Claimant

In the Disability Report - Adult, Claimant reported working after his alleged date of disability without changing his job duties or reducing his working hours. (Tr. 177-78). Claimant worked as a waiter/server. (Tr. 179).

In the Function Report - Adult completed on November 17, 2009, Claimant reported completing a breathing treatment each morning so that he can go to his server shift from 8:00 to 2:00. (Tr. 189). Claimant reported feeding his children, playing board games, and trying to do other activities with them. (Tr. 190). Claimant takes care of two rabbits and some fish. (Tr. 190). Claimant reported making meals including dinner three days a week, doing the laundry, vacuuming, sweeping, and cleaning the house twice a week. (Tr. 191). Claimant's interests include watching television, playing games with his children, and playing on his Play Station. (Tr. 193). Claimant listed playing games and reading books with his children and talking and watching television with his girlfriend as his social activities. He listed going to work, Wal-Mart, and the library as places he goes to on a regular basis. (Tr. 193).

In the Report of Contact dated February 4, 2010, Claimant reported on January 4, 2010 that he used to work 40 hours a week but often did not complete his hours and that the week before his schedule changed to three days a week, eight hours a day. (Tr. 209). Claimant reported always being out of breath, having fainting spells, and being weak. (Tr. 224). Claimant reported last working on February 16, 2009 and stopping because of a hospitalization. (Tr. 224). The general manager at Denny's reported that Claimant's schedule changed and was reduced at his request. (Tr. 211). The general manager reported that Claimant gets along great with customers and coworkers, and he does not have any behavioral problems. The general manager

noted that Claimant does not become short of breath while waiting on tables, and that he quit smoking recently.  In the last year, Claimant called in twice for medical reasons, and this year he has called in several times throughout the year.  (Tr. 211).

## III.    Medical Records

On May 4, 2007, Claimant received treatment at St. Mary's Health Center for heart palpitations.  (Tr. 280).  Claimant reported having similar episodes in the past every two to three months especially when using cocaine.  Claimant reported quitting smoking one month earlier. (Tr. 280).  Dr. Dean Breshears found Claimant had an episode of supraventricular tachycardia resolving with intravenous adenosine.  (Tr. 282).

On May 3, 2008, Claimant reported breaking out in a sweat and vomiting and experiencing chest pain. (Tr. 247-50).  Claimant reported having a heart attack one year earlier. (Tr. 251).  Claimant refused admission into the emergency room at Callaway Community Hospital and left.  (Tr. 251).

On March 29, 2009, Claimant received treatment in the emergency room at Callaway Community Hospital and reported being chronically ill for the last six months.  (Tr. 239). Claimant was diagnosed with COPD and sinusitis.  (Tr. 240).  The x-ray showed no acute radiographic process.  (Tr. 246).

On September 24, 2009, Claimant received treatment for his asthma in the emergency room at Callaway Community Hospital.  (Tr. 229-32).  Claimant reported he thought his heart problem was side effect of recreational drugs.  (Tr. 233).  The chest x-ray showed no acute radiographic process.  (Tr. 237).

In the Case Analysis Note dated December 7, 2009, the following is noted:

Clmt alleges disability beginning 3/1/09 due to a heart condition, COPD, fatigue, and periodic chest pain. This is a CC claim.

Clmt was seen for sweating, vomiting, CP, and ABD pain on 5/3/08. He had gastroenteritis. Clmt refused admission and left AMA. Clmt was seen on 3/29/09 for dizziness and cough. Clmt's 02 sats were 98% on room air. Chest xray negative. Clmt reported he had a MI in past. However, there is no confirmation of this. Exam showed clmt's breathing to be easy. MER indicated clmt was seen for a SOB and CP on 9/24/09. Clmt was diagnosed with acute bronchitis. Clmt stated he had an asthma attack 4 days prior. Exam noted clmt's breathing to be easy. However, wheezes were noted in the lung field. Xrays were negative.

Clmt was seen on 3 dates: 5/3/08, 3/9/09, and 9/24/09 in which all 3 times he specifically indicated he was not taking any meds. He was noted to have wheezing at only 9/09 ER visit and was given a nebulizer tx. Chest xrays are negative. Clmt reports on current application that he takes no chronic meds. Additionally clmt has not TP and only seeks emergent care. As clmt does not have established persistent asthma as indicated in the preamble of the listing 3.02, it would be pointless for DDS to undertake PFTs on this claim as previously noted above clmt would not meet requirements for listing level regardless of PFT results.

(Tr. 257).

On December 21, 2009, Dr. Laura Brenner, Ph.D., completed a psychological evaluation on referral by Disability Determination to aid in the determination of eligibility for Social Security Disability. (Tr. 258). Dr. Brenner noted Claimant's memory to be intact as shown by his ability to remember details of his personal history with no apparent difficulty. Dr. Brenner observed Claimant's behavior to be unremarkable. Dr. Brenner noted Claimant able to focus well enough to repeat six digits forward backward thereby placing him in the average range. Claimant reported currently working 20-24 hours a week as a waiter at Denny's, but he misses work for health reasons. Claimant cited his main work impediments to be emphysema, heart problems, and his temper and attitude. (Tr. 258). Claimant reported at times having increased energy and going

into a cleaning zone lasting for a few hours. (Tr. 259). Claimant reported drinking alcohol

heavily for fifteen years, but he cut back in prison five years earlier. Claimant uses marijuana to

help him stay mellow. (Tr. 259). Claimant reported his daily activities to include watching the

news, getting his daughters ready for school, going to work, cleaning the house, doing the

laundry, and making supper. (Tr. 260). Claimant reported currently not receiving any mental

health treatment, and was hospitalized four years earlier when he overdosed on cocaine. (Tr.

260). Claimant lives with his pregnant girlfriend of three months. (Tr. 261). Claimant has not

had a driver's license for sixteen years because of two DWIs. Dr. Brenner diagnosed Claimant

with major depressive disorder, recurrent, moderate marijuana abuse, COPD, and unspecified

heart problems and assessed his GAF to be 50. Dr. Brenner opined having difficulty determining

her specific diagnosis in a one-time meeting without his medical records. Dr. Brenner found

Claimant to have a history of substance dependence and continued to use marijuana. (Tr. 261).

In terms of functioning, Dr. Brenner opined as follows:

> Michael has the intelligence to learn new tasks with a reasonable amount of
> instruction. He has limited academic skills and will be more successful if tasks are
> demonstrated to him. His concentration and memory were intact today. His
> interpersonal skills are significantly impaired by irritability and emotional
> unpredictability. At the same time, he has held his current job for two years which
> suggests some degree of self-control on the job.

> The above results suggest that Michael would benefit from monitoring in the
> management of his funds, at least initially. No other recommendations follow from
> this evaluation.

(Tr. 261-62).

On January 5, 2010, Dr. Thomas Spencer, Psy.D., examined Claimant on referral for

psychological evaluation. (Tr. 284). Dr. Spencer noted Claimant arrived alone after driving

himself. Claimant reported working as a server at Denny's and being able to keep his anger in check in the workplace. (Tr. 284). Claimant reported five to six suicide attempts with his most recent in 1995. (Tr. 285). Claimant reported smoking marijuana as often as he can upwards to four times a week. (Tr. 286). Dr. Spencer included mood disorder, cannabis abuse, personality disorder, and assessed his GAF to be 45-50. (Tr. 287). Dr. Spencer opined that Claimant has a mental illness, one which interferes with his ability to engage in full-time employment and noted with appropriate treatment, compliance, and sobriety, his prognosis might improve. (Tr. 287).

In the Psychiatric Review Technique dated February 4, 2010, Dr. Mark Altomari, PhD, found Claimant to have affective disorders, personality disorders, and substance addiction disorders, marijuana abuse and ETOH dependence in partial remission. (Tr. 263-69). In the functional limitations, Dr. Altomari found Claimant to be mildly limited in activities of daily living and maintaining concentration and moderately limited in maintaining social functioning. (Tr. 271). Dr. Altomari noted that Claimant has not received any recent treatment for mental impairments so a consultative examination was ordered. (Tr. 273). During examination, the doctor noted that Claimant's social skills to be intact, and his memory intact. Dr. Altomari found Claimant's allegations to be partially credible at best noting inconsistencies with ADLs and MER. For example, Claimant reported having difficulty getting along with people, but he has been able to wait tables at a restaurant for 20 to 24 hours a week. Although not taking any medications, Dr. Altomari noted Claimant seems to be able to control his temper fairly well at work. Although Claimant reported having difficulty with memory in ADLs, during consultative examination, MER noted Claimant's memory to be intact. (Tr. 273).

In the Mental Residual Functional Capacity Assessment, Dr. Altomari found Claimant not to be significantly limited in understanding and memory, sustained concentration and persistence, and adaption. (Tr. 275-76). In social interaction, Dr. Altomari found Claimant to be moderately limited in his ability to accept instructions and to get along with coworkers, (Tr. 276). Dr. Altomari opined that Claimant

> has the ability to understand, remember, and carry out short and simple to complex instructions. He can adapt to most changes in the work place and can make simple to complex work-related decision(s). He can be anticipated to have difficulty interacting with supervisors and co-workers. However, clmt reported on 12/21/09 he is able to handle working with customers as he is currently a waiter.

(Tr. 277).

On February 9, 2010, Dr. Arun Kumar treated Claimant for initial cardiology visit for assessment of supraventricular tachycardia with associated palpitations and chest pain. (Tr. 333). Dr. Kumar noted Claimant has COPD and a history of smoking. Dr. Kumar noted that Claimant is a self-referral due to his concerns of frequent episodes of palpitations. (Tr. 333). Claimant reported recently receiving Medicaid and thus requesting evaluation to alleviate his symptoms. (Tr. 334). Claimant reported working as a server at Denny's and consuming significant amounts of coffee each day, occasionally smoking marijuana, and smoking cigarettes. (Tr. 334). Cardiovascular examination revealed no murmurs or clicks. (Tr. 335). Dr. Kumar observed Claimant to have a normal mood and affect. Dr. Kumar found Claimant to have chronic obstructive pulmonary disease and episodes of supraventricular tachycardia ("SVT"). Dr. Kumar urged Claimant to cut down his caffeine intake and to stop smoking. Claimant expressed interest in having ablative therapy for his SVT inasmuch as he cannot function with the frequent palpitation episodes. Dr. Kumar noted he would refer Claimant to Dr. Richard Weachter for

evaluation.  Dr. Kumar noted Claimant's COPD diagnosis is per Claimant's report and noted

Claimant needed to be assessed by a primary doctor and then possibly a pulmonary specialist.  Dr.

Kumar explained the importance of smoking cessation and its effects on his cardiovascular system

and overall health.  (Tr. 335).  Dr. Kumar discussed the importance of diet, exercise, and weight

control and encouraged Claimant to remain off cocaine and other illicit drugs.  (Tr. 335-36).

In the Family Medicine Clinic Note of February 10, 2010, Claimant sought treatment to

establish care and psychiatric medications.   (Tr. 303).  Claimant reported not having his psych

medications refilled for some time due to no insurance.  (Tr. 303).  Respiratory examination

showed lungs to be clear to auscultation and respirations non-labored.  (Tr. 304).  Cardiovascular

examination showed a normal heart rate, regular rhythm, and no murmur.  Dr. Joy Froelich found

Claimant to be cooperative.  Dr. Froelich prescribed lithium.  (Tr. 304).

On referral by Arun Kumar, Dr. Richard Weachter completed a cardiac electrophysiology

consultation on February 19, 2010.  (Tr. 299).  Claimant reported experiencing palpitations

associated with some lightheadedness and shortness of breath for last fifteen years.  (Tr. 300).

Claimant now experiences palpitations two to three times a week and with increasing frequency.

Dr. Weachter advised Claimant to decrease caffeine ingestion and prescribed Cardizem 180 mg

daily.  Claimant reported since starting Cardizem, he has had no significant palpitations.  Claimant

decreased his caffeine ingestion from two pots of coffee a day to one cup a day and two

caffeinated sodas.  Claimant smokes marijuana occasionally and has a twenty-five pack-year

history of smoking.  (Tr. 300).  Examination showed regular heart rate without murmur or gallop,

and lungs to be clear.   (Tr. 301).  Dr. Weachter noted Claimant to have appropriate affect and

mood.  Dr. Weachter listed probable adenosine-responsive supraventricular tachycardia, nicotine

abuse, and history of illicit drug use.  After discussing options, Claimant elected to have radiofrequency catheter ablation.  (Tr. 301).

Dr. Richard Weachter performed a radiofrequency catheter ablation on March 3, 2010. (Tr. 292, 310).  In the discharge instructions, Dr. Weachter directed Claimant to return in the clinic in one month with EKG.  (Tr. 311).

The echocardiography report of March 4, 2010, showed essentially a normal study.  (Tr. 289, 319-21).

In the March 31, 2010 Cardiology Clinic Note, Dr. Weachter noted how Claimant had undergone an electrophysiologic study which revealed a concealed left lateral pathway and inducible orthofromic SVT.  (Tr. 307-08).  Dr. Weachter performed a radiofrequency ablation with both retrograde aortic and transseptal approaches.  (Tr. 308).  Cardiovascular examination showed regular heart rate without murmur or gallop.  Dr. Weachter noted that Claimant appears to be responding suboptimally to moderate dose of propafenone.  Dr. Weachter opined that if Claimant's palpitations have not done well within one month, he would probably increase his sotalol dosage.  (Tr. 308).

The April 15, 2010 EKG reported multiple episodes of palpitations that correlated with SVT.  (Tr. 341).

On April 27, 2010, Claimant reported being diagnosed with bipolar disorder and schizophrenia and having been on medications most of his life.  (Tr. 351).[3]  Claimant reported ethanol dependence and drug use. (Tr. 352).  Claimant uses marijuana twice a week.  Claimant reported suicide attempts mostly by overdose of illicit drugs.  (Tr. 352).  In the medical history,

---

[3]The undersigned notes that Dr. Ahsan Syed's treatment notes documenting three office visits tend to be illegible.  (Tr. 349-55).

Dr. Syed listed COPD, SVT, and hypertension. (Tr. 353). Dr. Syed noted Claimant to be cooperative during the examination. (Tr. 353). Dr. Syed listed bipolar disorder, polysubstance dependence, antisocial personality disorder, COPD, and SVT in the impression section. (Tr. 354). Dr. Syed assessed his GAF to be 50. (Tr. 355). As treatment, Dr. Syed prescribed a medication regimen including a mood stabilizer. (Tr. 355).

In the Cardiology Clinic Note of April 30, 2010, Claimant returned for follow-up treatment of his adenosine responsive SVT due to a concealed left-sided accessory pathway. (Tr. 338, 344). Dr. Weachter noted that Claimant had undergone an electrophysiologic study in March which revealed a concealed left lateral accessory pathway and orthodromic SVT. (Tr. 338, 344). Dr. Weachter performed a radiofrequency ablation and ablation within coronary sinus. (Tr. 339, 345). Due to persistent palpitations, Dr. Weachter increased his sotalol dosage three weeks earlier. Claimant reported several episodes of palpitations each day. Cardiovascular examination showed regular heart rate without murmur, rub or gallop. EKG showed sinus rhythm and absence of a delta wave. Dr. Weachter found Claimant's ablation was unsuccessful possibly due to an epicardial pathway location and noted Claimant responding poorly to moderate dose sotalol. (Tr. 339, 345). Dr. Weachter discussed the need to avoid caffeine, alcohol, and stress. (Tr. 340, 346). Dr. Weachter explained how to perform carotid massage or the Valsalva maneuver. After discussing treatment options, Dr. Weachter decided to increase Claimant's sotalol dosage and completed Claimant's disability form. (Tr. 340, 346).

On May 4, 2010, Claimant called and reported chest tightness and daily palpitations. (Tr. 309). Dr. Weachter increased his sotalol dosage. (Tr. 309).

In a follow-up visit on May 4, 2010, Claimant reported continued instability and anger.

(Tr. 350).  Dr. Syed continued Claimant's medication regimen as treatment.  (Tr. 350).

On May 19, 2010, Dr. Weachter indicated Claimant's cardiac classification to be Class III. (Tr. 348).  Class III cardiac classification reads as follows: "Patients with cardiac disease resulting in marked limitation of physical activity.  They are comfortable at rest.  Less than ordinary activity fatigue, palpitation, dyspnea, or anginal pain."  (Tr. 348).

On June 8, 2010, Claimant requested changes in his medications.  (Tr. 349).  Dr. Syed noted Claimant to be cannabis dependence.  Claimant reported being angry and not having any suicidal thoughts.  Dr. Syed changed his medications.  (Tr. 349).

In the Medical Source Statement-Mental dated August 31, 2010, Dr. Syed found Claimant to be markedly limited in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance; to complete a normal workday and workweek without interruptions from psychological symptoms; to travel in unfamiliar places; and to set realistic goals.  (Tr. 356-57).  Dr. Syed found Claimant to be moderately limited in his ability to sustain ordinary routine; to ask simple questions; to get along with coworkers; to maintain appropriate behavior; to respond appropriately to changes in the work setting; and to be aware of normal hazards.  (Tr. 356-57).

On referral by Dr. Weachter, Dr. Niranjan Singh, a neurologist, evaluated Claimant for his right thigh numbness.  (Tr. 358).  Dr. Singh advised Claimant to avoid wearing tight clothing and to reduce his weight and prescribed Neurontin.  (Tr. 359).  Dr. Singh noted Claimant's mental status to be alert and oriented.  (Tr. 360).

## IV.     The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through December 31, 2012.  (Tr. 10).  Claimant has not engaged in substantial gainful activity since March 1, 2010, the amended alleged onset date.  (Tr. 10).  The ALJ found that the medical evidence establishes that Claimant has the severe impairments of chronic obstructive pulmonary disease (COPD), asthma, supravertricular tachycardia, bipolar disorder, personality disorder with anticsocial traits, posttraumatic stress disorder, and polysubstance abuse, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 10-12).  The ALJ found that Claimant has the residual functional capacity to perform sedentary work except he requires an at will sit/stand option and an indoor environment with clean air.  (Tr. 15).  The ALJ noted with regard to mental functioning, Claimant has the ability to perform simple, 1-2 step work-related tasks.  (Tr. 15). The ALJ found Claimant cannot perform any of his past relevant work.  (Tr. 19).  Claimant is a younger individual with at least a high school education and is able to communicate in English.  (Tr. 20).  Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ found there are jobs that exist in significant numbers in the national economy that Claimant can perform.  (Tr. 20).  The ALJ concluded that Claimant has not been under a disability from March 1, 2010, through the date of the decision.  (Tr. 21).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-42 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the
       claimant's impairments.

6.     The testimony of vocational experts when required which
       is based upon a proper hypothetical question which sets forth the claimant's
       impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese , 552 F.3d at 730 (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would

find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v.

Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether

the Commissioner's decision is supported by substantial evidence, however, the Court must

consider evidence that supports the decision and evidence that fairly detracts from that decision.

Id. The Court may not reverse that decision merely because substantial evidence would also

support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it

might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to

draw two inconsistent positions from the evidence and one of those positions represents the

agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d

891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the

ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the

available zone of choice") (internal quotations omitted).

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to give controlling weight to his treating mental health professionals. Claimant also contends that the ALJ erred in finding him able to perform sedentary work inasmuch as Dr. Weachter classified Claimant's cardiac condition as Class III.

A.    Weight Given to Treating Doctors

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to give controlling weight to his treating mental health professionals.

As the ALJ acknowledged in his decision, Claimant started attending psychiatric evaluations with Dr. Syed in April 2010 at the request of Claimant's representative, and Dr. Syed completed a medical source statement evaluating his mental functioning on August 31, 2010. Dr. Syed's treatment notes are brief and somewhat illegible, but the notes show Dr. Syed treated Claimant three times, April 27, May 4, and June 8, 2010, for bipolar disorder, polysubstance dependence, anti-social personality disorder, and posttraumatic stress disorder. (Tr. 349-55). In the initial evaluation, Dr. Syed described Claimant as being cooperative and having a goal directed thought process, and Claimant maintained good eye contact. Claimant reported still using marijuana twice a week. In the Medical Source Statement-Mental dated August 31, 2010, Dr. Syed found Claimant to be markedly limited in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance; to complete a normal workday and workweek without interruptions from psychological symptoms; to travel in unfamiliar places; and to set realistic goals. Dr. Syed found Claimant to be moderately limited in his ability to sustain

ordinary routine; to ask simple questions; to get along with coworkers; to maintain appropriate behavior; to respond appropriately to changes in the work setting; and to be aware of normal hazards.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "an ALJ may credit other medical evaluations over that of the treating physician when such assessments are supported by better or more thorough medical evidence." Id. (quoting Brown v. Astrue, 611 F.3d 909, 951 (8th Cir. 2011)). And, "'[w]hen deciding how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations.'" Id. (quoting Brown, 611 F.3d at 951). See also 20 C.F.R. §§ 404.1527(d) and 416.927(d) (listing six factors to be evaluated when weighing opinions of treating physicians, including supportability and consistency).

Title 20 C.F.R. § 404.1527(d) list six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the

claimant's] case record." 20 C.F.R. § 404.1527(d)(1)-(6). Consideration of these factors

supports the ALJ's decision not to give greater weight to the disability determination of Dr. Syed.

"It is permissible for an ALJ to discount an opinion of a treating physician that is

inconsistent with the physician's clinical treatment notes," Davidson v. Astrue, 578 F.3d 838, 843

(8th Cir. 2009), or when it consists of conclusory statements, Wildman v. Astrue, 596 F.3d 959,

964 (8th Cir. 2010). See also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming

ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment

notes); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating

physician's opinion is limited if the opinion consists only of conclusory statements."). Dr. Syed's

opinions are not supported by his treatment notes and are conclusory.

First, to the extent Dr. Syed opined that Claimant is disabled, a treating physician's

opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and

therefore is not the type of 'medical opinion' to which the Commissioner gives controlling

weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ acknowledged that Dr.

Syed was a treating source, but that his opinion was not entitled to controlling weight because it

is internally inconsistent and inconsistent with the objective medical evidence in the record. See

Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent

with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). As

noted by the ALJ, Dr. Khushalani noted how Dr. Syed found Claimant to be mildly limited in his

ability to deal with simple instructions and make simple decisions and markedly limited in other

areas of cognitive functioning to be inconsistent with Claimant's ability to handle these simple

tasks. The ALJ opined "[f]or instance, if the claimant is able to remember and carryout simple

instructions and make simple work-related decisions, it is unclear why the claimant's ability to complete a normal workday or workweek without interruption from psychological symptoms would be 'markedly' limited." (Tr. 18). Furthermore, Dr. Khushalani testified that Claimant's ability to set realistic goals would only be mildly limited to extent that these goals were simple.

The ALJ acknowledged that Dr. Syed was a treating source, but that his opinion was not entitled to controlling weight, because it was not well-supported by medically acceptable clinical and laboratory techniques. The undersigned notes no examination notes accompanied the medical source statement. Opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion).

Second, Dr. Syed's opinion is inconsistent with his treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). The ALJ properly accorded Dr. Syed's limitations in the medical source statement little weight inasmuch as his findings were inconsistent with, and unsupported by, the evidence of record. See Travis v. Astrue, 477 F.3d 1037, 1041

(8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.") (citation and internal quotation omitted).

As noted by the ALJ, Claimant reported to an evaluating doctor that he is able to cook without difficulty, follow recipes, clean, vacuum, sweep, do the laundry, tend to his hygiene, and go shopping and to the library. Likewise, at the hearing, Claimant testified that he helps care for his children and plays board and card games with his children and plays PlayStation 2. Claimant reported working as a server at Denny's for 20-24 hours per week and officially did not resign from his position until late March 2010. The ALJ opined "[t]he fact that the impairments did not prevent the claimant from working at the time strongly suggests that they would not currently prevent work." (Tr. 17). Dr. Khushalani found it noteworthy that Claimant continued to work as a server at Denny's as recently as December 2009, and thus it would be "reasonable to presume that if the claimant were in treatment and on medications, he would be able to function at even higher level than he was while he was working at Denny's." (Tr. 17). Furthermore, during his assessment with Dr. Altomari, Claimant acknowledged his ability to work with customers at his job as a waiter. During the consultative examination, Dr. Brenner found Claimant's concentration and memory to be intact.

In determining to afford little weight to the opinions of Drs. Spencer and Brenner, the ALJ noted how Claimant was employed as a waiter at the time Dr. Spencer's opinion was rendered. Further, Claimant through counsel indicated that his impairment only prevented him from consistently performing his job starting in March 2010 by amending the alleged onset date. The ALJ noted that Dr. Spencer offered his opinion two months and Dr. Brenner three months prior to the amended onset date. Likewise, Dr. Brenner noted Claimant's memory to be intact as

shown by his ability to remember details of his personal history with no apparent difficulty. Furthermore, Dr. Brenner noted Claimant has held his current job for two years which suggests some degree of self-control on the job.

With respect to the opinion of Dr. Weachter finding Claimant's Class III cardiac classification, the ALJ opined that "a sedentary level of exertion is consistent with the classification. Specifically, the classification explicitly states that an individual with such limitations would be 'comfortable at rest.'" (Tr. 19). Likewise, the ALJ noted how Ms. McQuade testified at the hearing that the Class III cardiac classification is consistent with sedentary work.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.    Sedentary Work

Claimant also contends that the ALJ erred in finding him able to perform sedentary work inasmuch as Dr. Weachter classified Claimant's cardiac condition as Class III.

20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are

met." Indeed, SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. ... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir.2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work." Id. at 997 (citing 1996 WL 374185 at *7).

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the ALJ properly assessed the medical evidence and Claimant's credibility. "The ALJ must determine a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to

others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited

his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record." ).

The ALJ's determination of Claimant's RFC is supported by substantial evidence in the record. Likewise, the ALJ noted several inconsistencies within the record, and he pointed out the lack of supporting objective medical evidence, activities of daily living, sporadic work record and noncompliance with recommendations from medical professionals to abstain from using marijuana, cigarettes, and caffeine. The ALJ also properly considered the Polaski factors in concluding that Claimant's subjective complaints are not supported by the objective medical evidence. The ALJ listed facts from Claimant's hearing testimony regarding the Polaski factors and the medical record that reflected upon Claimant's ability to perform sedentary work such as the lack of corroborating medical evidence and his daily activities. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case). Those included the absence of objective medical evidence of deterioration, sporadic work record, and history of noncompliance of medical recommendations.

Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform sedentary work except Claimant requires an at will sit/stand option. The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial

evidence to support a finding that Claimant retains an RFC to perform sedentary work as limited. Thus, the undersigned finds that substantial evidence supports the ALJ's finding that Claimant has the residual functional capacity to perform sedentary work except as set forth. The ALJ thus concluded that Claimant could not perform any of his past relevant work, but he would be able to meet the demands of unskilled sedentary work as limited in the RFC.

Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability). Indeed, the ALJ noted that Claimant did not officially resign from work until late March 2010. Further, the ALJ found that "[t]he record reveals that the claimant's allegedly disabling impairments were present approximately the same level of severity during the time he was working at Denny's. The fact that the impairments did not prevent the claimant from working at that time strongly suggests that they would not currently prevent work." (Tr. 17). See Lindsay v. Astrue, No. 08cv892 GAF, 2009 WL 2382337, at *3 (W.D. Mo. July 30, 2009) ("Plaintiff reported looking for work and contacting temporary agencies. These statements are inconsistent with disability and indicate that Plaintiff did not view his pain as disabling."). "'[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'" Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)).

A claimant's daily activities are proper considerations when evaluating his credibility. See

Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011); Halverson, 600 F.3d at 932. Claimant reported watching television, cooking, cleaning, vacuuming, sweeping, doing laundry, taking care of two of his children on a weekly basis, playing board and card games with his children, going grocery shopping and to the library, and playing PlayStation 2. "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility'." Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (quoting Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)).

The ALJ also discussed Claimant's history of noncompliance of medical professionals recommendations, noting that he continued to use marijuana, smoke cigarettes, and consume caffeine. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow a recommended course of treatment weighs against a claimant's credibility). If the ALJ finds that the claimant has not been compliant with prescribed medical treatment, the ALJ is justified in disregarding the claimant's subjective testimony regarding her disability. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (ALJ may consider noncompliance with medical treatment in decision to dispense with claimant's subjective complaints).

Next, the ALJ found Claimant's poor work history detracted from his credibility. See Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010) (ALJ properly considered claimant's sporadic work history prior to her alleged onset date as detracting from her credibility); accord Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008).

The ALJ found the Class III classification from Dr. Weachter not to be inconsistent with sedentary work. The ALJ opined that "a sedentary level of exertion is consistent with the classification. Specifically, the classification explicitly states that an individual with such

limitations would be 'comfortable at rest.'" (Tr. 19). Likewise, the ALJ noted how Ms. McQuade testified at the hearing that the Class III cardiac classification is consistent with sedentary work. Indeed, during the hearing, Ms. McQuade testified that she was competent to address the effect of cardiac classifications upon vocational issues and opined that the limitations resulting from a Class III cardiac condition would comport with sedentary work.

Further, the undersigned notes that ALJ did not find Claimant able to perform a full range of sedentary work by finding Claimant could only perform sedentary work that allowed him an at will sit/stand option. Accordingly, the ALJ considered Dr. Weachter's classification of Claimant's cardiac condition in formulating the RFC, and the ALJ's determination is not inconsistent with Dr. Weachter's opinion.

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner

denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen  (14) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may result in

a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.

1990).


                                        /s/ Terry I. Adelman
                                        UNITED STATES MAGISTRATE JUDGE

Dated this   25th   day of January, 2013.